FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**August 12, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

CENTER FOR BIOLOGICAL
DIVERSITY,

     Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; and LEE
ZELDIN, Administrator, United States
Environmental Protection Agency,[*]

     Respondents,

and

STATE OF COLORADO,

     Intervenor - Respondent.

----------------------------------

AMERICAN PETROLEUM INSTITUTE,

     Amicus Curiae.

No. 23-9503
(EPA No. EPA-R08-OAR-2020-0103.)
(Environmental Protection Agency)

_____

**ORDER**

_____

Before **BACHARACH**, **BALDOCK**, and **CARSON**, Circuit Judges.

_____

_____

[*]Pursuant to Fed. R. App. P. 43(c)(2) Michael S. Regan is replaced by Lee Zeldin
as the Administrator of the Environmental Protection Agency.

Respondents' *Motion to Amend Opinion* is GRANTED to the extent of the changes in the attached corrected opinion, which shall be filed as of today's date.

Entered for the Court,

CHRISTOPHER M. WOLPERT, Clerk

FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

UNITED STATES COURT OF APPEALS

**August 12, 2025**

FOR THE TENTH CIRCUIT

**Christopher M. Wolpert
Clerk of Court**

_____

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| Petitioner, | |
| v. | No. 23-9503 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and LEE ZELDIN, Administrator, United States Environmental Protection Agency | |
| Respondents, | |
| and | |
| STATE OF COLORADO, | |
| Intervenor - Respondent. | |
| -------------------------------- | |
| AMERICAN PETROLEUM INSTITUTE, | |
| Amicus Curiae. | |

_____

**PETITION FOR REVIEW OF FINAL ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

_____

Ryan Maher, Center for Biological Diversity, Washington, D.C., for Petitioner.

David Mitchell, United States Department of Justice, Environment and Natural Resources Division, Environmental Defense Section, Washington, D.C. (Todd Kim, Assistant Attorney General, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Everett Volk, Office of Regional Counsel, and Brian Doster, Office of General Counsel, United States Environmental Protection Agency, Washington, D.C., with him on the briefs), for Respondents.

Laura Terlisner Mehew, Senior Assistant Attorney General, Office of the Attorney General for the State of Colorado, Natural Resources and Environment, Denver, Colorado (Philip J. Weiser, Attorney General, and William Allen, Office of the Attorney General for the State of Colorado, Denver, Colorado, and Benjamin Elrod, Colorado Department of Law, Denver, Colorado), for Intervenor-Respondent.

John H, Bernetich, Jennifer L. Biever, and Dale T. Ratliff, Williams Weese Pepple & Ferguson PC, Denver, Colorado, filed an amicus curiae brief in support of Respondents and Intervenor-Respondent.

_____

Before **BACHARACH**, **BALDOCK**, and **CARSON**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

Under federal law, states must adopt implementation plans to meet national standards for ambient air quality. These plans are subject to approval by the EPA.

Colorado adopted an implementation plan and revised it in 1997. In 2019, Colorado revised the plan again, changing the wording of a permit requirement for new emission sources and adding to the definition of a key

2

threshold to evaluate compliance. The EPA approved these revisions; and the Center for Biological Diversity challenges this approval, arguing that

- the revision to the permit requirement prevents regulators from blocking construction when a new source would generate excessive emissions and

- the additional language in the definition allows regulators to disregard emissions during drilling, fracking, and well completion.

We reject the first challenge, concluding that the Center has not shown an effect from the revised wording in the permit requirement. But we agree with the Center on its second challenge, concluding that the EPA acted arbitrarily and capriciously by failing to address the potential emissions during drilling, fracking, and well completion.

## Background

### I.    The states must adopt implementation plans providing for review of emissions from new sources.

The EPA and the states share responsibility for implementing the Clean Air Act. *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012). For its part, the EPA caps the concentration of common pollutants in the ambient air. 42 U.S.C. § 7409(a). (The Clean Air Act calls these caps *national ambient air quality standards*. *Id.* § 7409(b)(1)–(2).) The states must then adopt implementation plans to attain compliance with these standards. *Id.* § 7410(a)(1). A state's implementation plan

- is enforceable as state law and

- becomes enforceable as federal law upon approval by the EPA.

*See Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994).

The implementation plans require states to establish a process for granting permits that regulate construction and modification of stationary sources of air pollution. *Id.* § 7410(a)(2)(C). The permitting process must include

- a procedure to determine whether a source will interfere with attainment of national air quality standards and

- a mechanism to block construction or modification of stationary sources that would interfere with the attainment of these standards.

40 C.F.R. § 51.160(a)–(b).

## II.    Colorado adopts regulations on new stationary sources.

Given these requirements, Colorado has required permits for the construction, operation, or modification of stationary sources that emit pollutants. When a permit is requested, a state agency conducts a *preliminary analysis*. The Center contends that during a *preliminary analysis*, the state agency determines

- whether the source would interfere with the attainment of national air quality standards and

- whether the source would be eligible for a *minor* source permit or would need the more stringent permit required for *major* sources.

Appellant's Opening Br. at 16 (citing 5 Colo. Code Regs. § 1001-5:3.B.III.B.7.c–d). According to the Center, these determinations are based on the potential for emissions at the projected "commencement of operation." *Id.* (citing 5 Colo. Code Regs. § 1001-5:3.B.III.B.7).

**III.    Regulators consider Colorado's proposed implementation plan.**

Colorado undertook a rulemaking to revise parts of the implementation plan. The Center participated in the rulemaking and generally supported Colorado's effort to update the implementation plan. But the Center

- didn't explicitly take a position on any specific provisions and

- said that it would promote improvements to the plan.

Colorado adopted the revisions, and the EPA initiated a rulemaking to consider the revisions. The Center objected, urging the EPA to reject the revisions to the permit requirement and the additional language defining the threshold to evaluate compliance (*commencement of operation*). The EPA rejected the objections and approved the revisions, leading the Center to bring this challenge. The State of Colorado intervened to defend the revisions.

**Discussion**

**I.    The Center did not waive its objections.**

Colorado argues that the Center waived its objections by inviting the alleged errors during Colorado's rulemaking process. For this argument,

5

Colorado relies on the *invited error* doctrine, which "prevents a party who induces an erroneous ruling from being able to have it set aside on appeal." *United States v. Burson*, 952 F.2d 1196, 1203 (10th Cir. 1991). So this doctrine might apply if the Center had asked the EPA to approve Colorado's revisions. But Colorado doesn't suggest that the Center supported the revisions during the EPA's rulemaking; Colorado instead points to comments in its own rulemaking process, which we're not reviewing.

Even if the *invited error* doctrine could be triggered by comments in Colorado's rulemaking (rather than the EPA's), the doctrine wouldn't apply here. We apply the doctrine only when the record clearly shows that a party previously supported an action and later challenges it on appeal. *See United States v. Flechs*, 98 F.4th 1235, 1252 n.15 (10th Cir. 2024) ("Invited error must be clear from the record.").

The Center didn't clearly support the revisions that it is now challenging. In the Colorado proceedings, the Center stated only that it "generally support[ed]" the updating of Colorado's implementation plan, cautioning that it wasn't taking any "position on the specific provisions." R. 902. In making these statements, the Center didn't clearly support either of the disputed revisions.

6

**II.    We evaluate the EPA's approval under the arbitrary-and-capricious standard.**

Because the *invited error* doctrine doesn't apply, we must review the EPA's decision, guided by the Administrative Procedure Act. *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009). Under this Act, the decision is unlawful if the EPA acted arbitrarily and capriciously by failing to consider an important aspect of the problem or to provide a rational explanation for the decision. *Id.* at 1122–23; *see* 5 U.S.C. § 706(2)(A).

**III.    The EPA didn't err in approving the revision to the permit requirement.**

The Center challenges a revision in Colorado's wording of its requirement for a permit. Before the revision, the implementation plan had said that regulated parties couldn't "[c]ommence construction or modify" a stationary source without a permit. R. 47. In 2019, Colorado revised the implementation plan to say that regulated entities couldn't "[c]onstruct, operate, or modify" a stationary source without a permit. *Id*. 12, 47.

The Center challenges the revision based on two arguments:

1.    Colorado's program violates federal regulations by failing to block some projects that would interfere with the attainment of national air quality standards.

2.    The EPA failed to assess the effect of the revision on Colorado's progress toward attainment of these standards.

We reject both arguments. The first argument involves a perceived flaw in permits unrelated to the language in the 2019 revisions.[1] The second argument disregards the EPA's findings.

**A.    The revisions didn't cause the alleged violation.**

The first argument consists of three steps:

1.    Under federal regulations, an implementation plan must block construction of stationary sources that would interfere with the attainment of national air quality standards. 40 C.F.R. § 51.160(a)–(b).

2.    Colorado prohibits the construction, operation, or modification of stationary sources without a permit.

3.    Colorado issues general permits that allow construction upon submission of an application (before the state has considered the effect on air quality).

The problem with this argument is that the disputed revision didn't affect Colorado's general permits.

Before the revision, operators of stationary sources needed a permit before constructing the source. The revision didn't address that requirement. But the Center complains that some permits allow the start of construction as soon as someone submits an application (before regulators can assess the effect on air quality).

---

[1]    Under certain circumstances, revisions might reopen a regulatory scheme to new challenges. *See Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 150–51 (D.C. Cir. 1990) (discussing whether an agency had reopened an issue). But the Center does not argue that these circumstances existed here.

If the Center is right, its complaint lies with Colorado's process for issuing general permits. But if Colorado's process is defective, that fault doesn't lie with the 2019 revisions. In fact, the EPA has never approved a provision in Colorado's implementation plan that would allow construction to start before the owner gets a permit. So even if the general permits served to bypass federal regulations, the violation would not arise from the 2019 revisions to the implementation plan.

The Center nonetheless argues that the EPA wrongly assumed that sources couldn't start construction before the issuance of a permit. From the EPA's standpoint, however, this alleged assumption would have been right because Colorado's implementation plan had already required a permit prior to construction. 5 Colo. Code Regs. § 1001-5:3B.III.I.2. If Colorado regulators are issuing permits in violation of the implementation plan, that violation wouldn't stem from the 2019 revision. So we reject this challenge.

**B.    The EPA did make the required finding.**

The Center also points to federal law, which requires the EPA to reject a revision if it would interfere with the state's attainment of national air quality standards. 42 U.S.C. § 7410(l). According to the Center, the EPA violated this requirement by approving the revision without evaluating Colorado's progress toward attainment of national air quality standards. We disagree. The EPA expressly found that the revision would not interfere

9

with the attainment of national air quality standards, and the Center has not shown an error in that finding.

The Center argues that the EPA assumed that Colorado's revision wouldn't create substantive changes in the permit requirement. But that assumption is right: Colorado just changed

*commence construction or modify* to

*construct, operate, or modify*.

And a separate provision already required a permit to "commence" any of these activities. 5 Colo. Code Regs. § 1001-5.3B.III.I.2.a, c. So the changes simply

- deleted the verb *commence* before the noun *construction* to avoid a redundancy,

- turned a nominalization (*construction*) into a verb (*construct*), and

- added a second verb (*operate*).

These changes didn't affect the meaning. So if the EPA had assumed that the changes to the implementation plan weren't substantive, that assumption would have been right.

* * *

In sum, the Center has not shown that the EPA acted arbitrarily or capriciously by approving Colorado's revised wording of the permit requirement. So we reject the Center's challenge to this revision.

10

**IV.**   **The EPA erred in approving the revised definition of the term** *commencement of operation.*

The 2019 revision also added language to the definition of the term *commencement of operation*. Before the revision, the definition had stated: "A new source commences operation when it first conducts the activity that it was designed and permitted for (i.e., producing cement or generating electricity)." R. 1815. The revision added a second sentence:

> In addition, for oil and gas well production facilities, commencement of operations is the date any permanent production equipment is in use and product is consistently flowing to sales lines, gathering lines or storage tanks from the first producing well at the stationary source, but no later than the end of well completion operations (including flowback).

*Id.*

**A.**   **The Center did not forfeit an objection to the revised definition.**

The EPA and Colorado argue that the Center forfeited its objection by failing to raise it during the EPA's rulemaking. To address this argument, we consider whether the Center made the objection with "sufficient specificity reasonably to alert the agency." *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001), *quoted with approval in Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1127 (10th Cir. 2009). Under this standard, the Center could refine its argument in the appeal as long as the objection had alerted the EPA to the general substance. *WildEarth Guardians v. EPA*, 770 F.3d 919, 943 (10th Cir. 2014).

11

**1.**    **The Center's comments alerted the EPA to the general substance of the argument.**

In the EPA rulemaking, the Center complained that the revised definition "excludes emissions prior to operations such as [emissions from] drilling, fracking, and completion." R. 3993. The Center makes the same argument here.

Granted, the Center has elaborated here on how the revision disregards emissions from drilling, fracking, and well completion. Even without that elaboration, however, the EPA understood that the Center was objecting to the definition of *commencement of operation*, responding that the revision had only been "procedural" and hadn't excluded "any types of sources from review." *Id.* 6.

The EPA argues that it understood the comment to address the part of the definition that had existed since 1997.[2] But that understanding rests on a cramped reading of the Center's comment. The Center focused its comment solely on the new definition's alleged exclusion of "pollution emitting activities such as drilling wells, 'fracking' wells, and completing wells." *Id.* 3993. This focus should have alerted the EPA to the Center's concern with the new language covering emissions from drilling, fracking,

---

[2]    That definition didn't refer to oil-and-gas operators; the revision purported to explain how the definition applied to oil-and-gas facilities. 87 Fed. Reg. 16,439–40 (Mar. 23, 2022).

and well completion. So the Center adequately preserved the issue even if the EPA had misunderstood the comment.

**2.     The comment sufficed even though the Center didn't use the term *preliminary analysis* or cite some relevant regulations.**

The EPA argues that the Center's comments didn't refer to

- the term *preliminary analysis*,

- the other relevant parts of Colorado's implementation plan, or

- the federal regulation defining a *major source* and the *potential to emit*.

But a commenter can explain its concern without using technical language or citing the relevant regulations. The D.C. Court of Appeals addressed a similar issue in *National Petrochemical & Refiners Association v. EPA*, 287 F.3d 1130 (D.C. Cir. 2002) (per curiam).[3] There a comment stated that the product had worked "only . . . within a narrow temperature range," but didn't refer to the regulatory term (*cold-start portion*). *Id.* at 1139. The D.C. Circuit concluded that the commenter had reasonably presented the issue without using the technical term. *Id.*

---

[3]     *National Petrochemical* involved a statutory standard for preservation that does not apply here. 287 F.3d at 1139 (citing 42 U.S.C. § 7607(d)(7)(B)). But that statutory standard resembles the standard that applies here. *Compare* 42 U.S.C. § 7607(d)(7)(B) (requiring "reasonable specificity"), *with Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) (requiring "sufficient specificity reasonably to alert the agency"), *quoted with approval in Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1127 (10th Cir. 2009).

13

The same is true here. The Center's comments didn't refer to the term *preliminary analysis*. But the Center otherwise stated its concern with the new carveout for pollutants emitted during drilling, fracking, and well completion. The EPA should have understood the Center's concern without the legal term *preliminary analysis*. *See NPCA v. BLM*, 606 F.3d 1058, 1065 (9th Cir. 2010) (stating that a commenter doesn't need to recite its argument "in precise legal terms"). Likewise, the Center could alert the EPA to the general substance of the concerns without citing every relevant regulation. *See WildEarth Guardians v. EPA*, 770 F.3d 919, 942–43 (10th Cir. 2014) (holding that a commenter's failure to cite a particular regulation was "not fatal" to preservation of a regulatory challenge).

* * *

In sum, we conclude that the Center did not forfeit its objection to the revised definition.

**B.    The EPA improperly assumed that the revision wasn't substantive.**

The Center contends that the revised definition creates a new exclusion for pollutants emitted before a well starts producing. The EPA apparently credited Colorado's characterization of the revision as "clarifying." R. 6. But the EPA didn't independently assess that characterization. By failing to independently assess that characterization, the EPA acted arbitrarily and capriciously. *See Ariz. Pub. Serv. Co. v. EPA*,

14

562 F.3d 1116, 1123 (10th Cir. 2009) (stating that an action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem").

Colorado argues that the revisions didn't create the alleged environmental problems because

- the revised definition hadn't changed the method of calculating potential emissions and

- the Center is relying on emissions from nonroad engines even though they are exempt from regulations.

But the EPA didn't independently assess the first explanation or rely on the second one. To the contrary, the EPA approved the revised definition based solely on Colorado's statement that it wasn't changing the meaning of the term *commencement of operation*. R. 6; *see* p. 14, above. So we cannot uphold the EPA's approval based on Colorado's arguments defending the revision. *See Alameda Water & Sanitation Dist. v. Browner*, 9 F.3d 88, 91 (10th Cir. 1993) ("A court may not uphold an agency action on grounds not relied on by the agency.").

### C.  The appropriate remedy is remand rather than vacatur.

Because the EPA's acceptance of Colorado's characterization was arbitrary and capricious, we must decide whether to vacate the approval or to remand for reconsideration. For that decision, we consider two factors:

1.  the seriousness of the error and the likelihood that the EPA can justify its decision on remand and

15

2.    the disruptive consequences of vacatur.

*See Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023) (citing *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). The first factor supports remand, and the second factor does not tilt heavily either way.

**1.     The EPA may be able to justify its decision on remand.**

For the first factor, we consider whether the EPA may be able to justify the revised language with a fuller discussion. *Diné Citizens*, 59 F.4th at 1049. Of course, we can't know whether the error is curable until the EPA explains why it approved the change. So we can consider only the possibility that the EPA might be able to justify the revision with a fuller explanation. *Shafer & Freeman Lakes Envir. Conserv. Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021). This inquiry requires some measure of speculation about the EPA's ability to justify the revision.

Colorado has argued that the revision serves only to clarify what the prior plan allowed. On remand, the EPA can independently evaluate that argument. To do so, the EPA can assess the applicability of the prior definition to oil-and-gas wells and determine whether the revision creates a substantive change. If the revised definition doesn't affect the timing of an oil-and-gas well's *commencement of operations*, a fuller explanation might salvage the revised definition. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20–21 (2020) (stating that the agency may

16

justify a decision by providing a fuller articulation of an observation that had earlier been conclusory).

The Center insists that the EPA can't salvage its approval by supplementing the record. But the EPA hasn't said how the prior definition applied to oil-and-gas wells. Depending on how the prior definition had applied to oil-and-gas wells, the EPA might have been right to characterize the revision as a clarification rather than a substantive change.

### 2.    The potential for disruption doesn't clearly weigh for or against vacatur.

The second factor concerns the potential disruption from vacatur. *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023). When evaluating this factor, we consider disruptive consequences for the regulated industry and the interests protected by the disputed policy. *Id.* These consequences don't clearly weigh for or against vacatur.

The impact of vacatur turns partly on the impact of the 2019 revision. The Center insists that the revision created a new carveout for emissions from drilling, fracking, and well completion; the EPA counters that the revision served only to clarify the existing definition. If the Center is right, vacatur would create an apparent difference between federal law and state law: The carveout for drilling, fracking, and well completion would disappear under federal law and remain under state law. *See*

17

*Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994) (noting that provisions of an implementation plan, when approved by the EPA, have "the force and effect of federal law"). But the difference could prove illusory because Colorado can't implement a permitting scheme that undermines a federally approved implementation plan. 42 U.S.C. §§ 7416, 7604(f).

On the other hand, the Center argues that

- vacatur would help bring Colorado's regulations into compliance with federal law and

- continuation of the revised definition would allow greater emissions from oil-and-gas wells.

But these arguments assume that the revised definition created a substantive change, and we cannot assess that assumption until the EPA provides a fuller explanation.

The parties' respective arguments thus turn on whether the revision created a substantive change. And we can't evaluate that possibility in a meaningful manner until the EPA provides a fuller explanation. In these circumstances, the second factor doesn't tilt heavily for or against vacatur.

\* \* \*

The second factor doesn't weigh heavily in either direction, but the first factor supports remand without vacatur. So we remand to the EPA without vacating its prior approval of the revised definition of the term *commencement of operation.*

18

**D.** **We decline to impose a deadline for the EPA to act on remand.**

In its reply brief, the Center asks us to impose a deadline for the EPA to provide a fuller explanation. Because the Center didn't make this request in its opening brief, the EPA hasn't had a chance to respond. Without input from the EPA, we have little basis to assess the feasibility of particular deadlines. We thus decline to apply an arbitrary deadline for the EPA to provide a fuller explanation for the revised definition.[4]

## Disposition

For the revised permit requirement, we deny the petition for review. But we grant the petition as to the revised definition of the term *commencement of operation*. With this grant of the petition, we remand to the EPA for further explanation of the decision to approve the revised definition.

---

[4]     If the EPA takes too long, the Center can seek an order compelling expedited action. *See* 5 U.S.C. § 706(1) (authorizing reviewing courts to "compel agency action . . . unreasonably delayed").

19